IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| WILBERT WATSON, JR., *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0903 |
| | § | |
| GARY WAKEFIELD, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Wilbert Watson, Jr., and Michael Wade Prince, state inmates proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit against prison officials for denial of religious freedom and equal protection, violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), and conspiracy. Defendants filed a motion for summary judgment (Docket Entry No. 20), to which plaintiffs responded (Docket Entries No. 28, 29, 31, 32).

Based on the pleadings, the motion, the responses, the record, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment, and **ORDERS** as follows.

### I.  FACTUAL BACKGROUND AND CLAIMS

This lawsuit arises from plaintiffs' unsuccessful attempt to have the inmate Islamic coordinator of the Ellis Unit resign during a scheduled Muslim inmate prayer meeting, and the resulting temporary suspension of their participation in Muslim religious activities.

Wilbert Watson and Michael Wade Prince are Muslim inmates incarcerated at the Ellis Unit in Huntsville, Texas. They bring this action against Gary Wakefield, former assistant warden at the Ellis Unit; David Franshaw, a sergeant at the Ellis Unit; Bill Pierce, the director of chaplaincy; Akbar Shabazz, the regional Islamic chaplain for the Ellis Unit; and Chris Athey, a non-Islamic chaplain assigned to the Ellis Unit. Plaintiffs sue these defendants in their official and individual capacities.

The record shows that, on July 14, 2006, Ellis Unit Muslim inmates met in the unit's chapel for a scheduled prayer service.[1] The services were conducted by inmate L.C. Jones, the prison-appointed Ellis Unit Islamic coordinator. During the prayer meeting, but prior to actual commencement of prayers, plaintiffs and eight other inmates confronted Jones, accused him of being "incompetent of the Islamic religion," and asked him to step down as the inmate coordinator. (Docket Entry No. 28, p. 4.) Jones refused to do so. Prince, utilizing the chapel microphone, began speaking to the entire congregation. Jones took the microphone back from Prince and told him that he (Prince) was not speaking, but Prince continued speaking to the group without the microphone. *Id.* Jones left the chapel and returned with defendant Sergeant Franshaw. Franshaw told the inmates to wait for the

---

[1]Plaintiffs and three other inmates signed five identically-worded "affidavits" submitted under Docket Entry No. 31. Because these documents were neither sworn under oath and notarized nor executed under penalty of perjury pursuant to 28 U.S.C. § 1746, they form no basis for the Court's factual analysis. However, substantially all of the allegations set forth in those documents were presented under penalty of perjury in other portions of plaintiffs' responsive pleadings (Docket Entries No. 28, 29), and do form a basis for the Court's factual analysis.

Muslim Chaplain Akbar Shabazz to choose another inmate coordinator,[2] and plaintiffs and a few other inmates left. *Id.* Plaintiffs aver that defendant Wakefield subsequently told them, "You have done nothing wrong, there are enough of you that we want to talk to Chaplain Shabazz before we allow you back in the chapel." (Docket Entry No. 29, p. 2.)

The next evening when plaintiffs and other Muslim inmates met for evening prayers, Jones instructed an inmate to tell plaintiffs and a few other inmates to leave the chapel. *Id.* Jones again brought in Franshaw, who told plaintiffs that they and the few other inmates could not attend the services until they first spoke with Shabazz. *Id.* The record does not reflect that plaintiffs made any attempt to speak with Shabazz.

On July 17, 2006, plaintiffs and the few other inmates were called to a meeting with Warden Wakefield and Unit Chaplain Athey. *Id.* Plaintiffs were told that they were not to attend Muslim services in the chapel until speaking with Shabazz. As before, nothing in the record shows that plaintiffs made any attempt to speak with Shabazz. An inter-office communication was issued that same day, suspending plaintiffs and the few other inmates from attending Muslim services. *Id.* On September 7th or 15th, Shabazz reinstated all but Prince and four other Muslim inmates to return to services "so that as many of the Muslim offenders as possible could participate in religious activities without the possibility of another security issue occurring." (Docket Entries No. 21, Exhibit A; No. 28, p. 5.)

---

[2]Shabazz, the regional Islamic chaplain for the Ellis Unit, became ill before these events occurred and was unable to work for several months. During his convalescence in July 2006, Ellis Unit officials advised him of these events, and Shabazz instructed the officials on how the situation was to be handled. (Docket Entry No. 21, Exhibit A.)

The Islamic Ramadan began on September 24, 2006, and ended on October 23, 2006. The five inmates, including plaintiffs, were still excluded from the activities and services during this period of time, but plaintiffs apparently were able to observe Ramadan fasting requirements with help from fellow Muslim inmates. (Docket Entry No. 21, Exhibit A.) Shabazz met with the entire Ellis Unit Muslim offender community on October 2, 2006, but nothing shows that plaintiffs attempted to speak with him at that time. *Id.*

On October 21, 2006, Shabazz again met with the entire inmate Muslim community at Ellis Unit, and informed them that he was retaining Jones as the inmate Muslim coordinator because there was no justification for his removal. Prince became angry at this announcement, and as he left the chapel, told Shabazz to remove him from the Muslim roster as he was not coming back. (Docket Entry No. 21, p. Exhibit A.) On October 29, 2006, Prince requested that defendant Athey allow the five suspended inmates to hold their own Jumah services on Friday. Athey again responded that Prince needed to seek a resolution directly with Shabazz. (Docket Entry No. 28, p. 5.)

It is unclear when plaintiffs returned to services. Shabazz states that he personally observed Prince at services on October 6th, 7th, and 13th. (Docket Entry No. 21, Exhibit A.) Plaintiffs, while not directly contesting Shabazz's statement, testified that they and the other three inmates received official lay-ins on January 12, 2007, allowing them to return to services. (Docket Entry No. 28, p. 5.)

4

Plaintiffs claim that their actions on July 14, 2006, caused no security issue and violated no prison rules or regulations. They argue that they were exercising their First Amendment rights to religious freedom, and that their six month suspension from Muslim inmate activities violated those rights and denied them religious protections imparted by RLUIPA (Docket Entry No. 29, p. 3.) Defendants disagree, and contend that plaintiffs caused their own temporary suspension from Muslim inmate activities by attempting an unsuccessful "power play" to oust Jones in lieu of following established prison grievance procedures. (Docket Entry No. 20, p. 12.) According to defendants, plaintiffs chose to disrupt prison religious services under the guise of exercising their religious rights.

In their complaint, plaintiffs seek damages under 42 U.S.C. § 1983 for the alleged violation of their rights to free exercise under the First Amendment and equal protection under the Fourteenth Amendment. They also assert a cause of action under RLUIPA and allege that defendants conspired to deprive them of their civil rights. Plaintiffs seek a declaratory judgment, injunctive relief, and nominal, compensatory and punitive damages.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C).  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for

the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court may not weigh the evidence or make credibility determinations. *Id.* Conclusory allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are insufficient to defeat a summary judgment motion. *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754-55 (5th Cir. 2000).

The movant's initial burden is to demonstrate that no genuine issue of material fact exists. *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005). If the movant satisfies that initial burden by establishing the absence of evidence to support an essential element of the non-movant's case, the burden shifts to the party opponent to establish that there is a genuine issue of material fact. *Id.* An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. *Id.* Facts are to be construed in the light most favorable to the non-moving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III.  CLAIMS FOR INJUNCTIVE RELIEF

To invoke the jurisdiction of a federal district court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. *Lewis v. Continental Bank Corp.*, 494 U. S. 472, 477 (1990). A case or claim becomes moot if (1) there is no reasonable expectation that the alleged

violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). "The mootness doctrine requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). This issue of mootness in the instant case arises whether plaintiffs seek injunctive relief under the First Amendment or RLUIPA.

Plaintiffs concede that, by the time they filed this lawsuit, the prior security issue was resolved and they were again attending religious services. They claim, however, that because other Muslim inmates are upset over the filing of this lawsuit, and because plaintiffs remain dissatisfied with the administration's handling of plaintiffs' complaints, there exists a "possibility" of plaintiffs' being denied their right to attend services in the future. Plaintiffs' argument is purely speculative, and presents no probative summary judgment evidence that prior conditions reasonably may be expected to recur. Because there remains no live controversy regarding plaintiffs' rights to attend prison services under the circumstances raised in this lawsuit, and because those prior conditions cannot reasonably be expected to recur, plaintiffs' request for prospective injunctive relief is moot, and their claims for injunctive relief are dismissed.

## IV.   CLAIMS FOR DENIAL OF FREE EXERCISE

Plaintiffs claim that, by suspending them from Muslim inmate religious services for six months, defendants violated their First Amendment right to religious free exercise. Although plaintiffs lodge this claim against defendants in their individual and official capacities, they are not entitled to proceed against defendants in their official capacities, and those claims are dismissed. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66-67 (1989).

Prisoners retain those First Amendment rights that are consistent with their status as prisoners or with the legitimate penological objectives of the prison. *Hudson v. Palmer*, 468 U.S. 517, 523 (1984).   With regard to religious free exercise claims under the First Amendment, the Fifth Circuit holds that where a prison regulation or rule impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Green v. Polunsky*, 229 F.3d 486, 489 (5th Cir. 2000), citing *Turner v. Safley*, 482 U.S. 78, 89 (1987). "A prisoner's First Amendment rights may be circumscribed when legitimate penological objectives such as institutional order and security outweigh the concerns associated with preservation of the inmate's right." *Schmidt v. Johnson*, 75 F. App'x 218, 220 (5th Cir. 2003).

Issues of prison safety and security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence that . . . the officials have exaggerated their response to these considerations, courts should

8

ordinarily defer to their expert judgment in such matters." *Mayfield v. Texas Dep't of Crim. Justice*, 529 F.3d 599, 607 (5th Cir. 2008); *see also Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002). Under *Turner*, a court "must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414-15 (1989); *see also Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992) (holding that "rationality" is the controlling standard).

In the instant case, the record shows that, on July 14, 2006, the Ellis Unit Muslim inmate community congregated in the prison chapel for a scheduled religious prayer meeting. The meeting was conducted by Jones, the prison-approved inmate coordinator for Muslim services. Plaintiffs and a few other inmates approached Jones, criticized him, and asked him to step down. Plaintiff Prince ignored Jones's instruction to stop talking, and Jones requested intervention by a prison official. Prison officials subsequently contacted Shabazz, who was on an extended medical absence. In his affidavit submitted in support of summary judgment, Shabazz testified, in relevant part, as follows:

> Offender L.C. Jones volunteered and was approved to serve as the Ellis Unit Muslim Offender Coordinator approximately five or six years ago. He is assigned to facilitate the most important worship event in Islam – the weekly Jumah prayer service – and provide coordinating assistance to the unit chaplain or myself with the unit's Muslim community regarding scheduled Islamic meetings, faith activities and practices. As a coordinator, Offender Jones is expected and required to conduct himself in accordance with Islamic law and TDCJ rules and policies. He is also required to constantly advise the unit chaplain and/or me regarding all issues that arise.

9

In 2006, I became ill and was unable to visit my assigned units for a few months. During my convalescence in July 2006, I was advised that Offender Michael Prince and several other Muslim offenders disrupted the Jumah prayer service with a demand that offender Jones be removed as the coordinator. Offender Jones and Sergeant David Franshaw called me at home to discuss this situation. I requested that unit security bar Offender Prince and his supporters from Islamic services until I was able to meet with them. On September 7, 2006, I released all but Prince and four others from the suspension. I made this decision so that as many of the Muslim offenders as possible could participate in religious activities without the possibility of another security issue occurring. Ramadan began on September 23, 2006, and continued until October 22, 2006. Prince and four other offenders did not openly participate in Ramadan due to the suspension, but I was informed that with help from other Muslim offenders Prince did observe the fasting requirements for Ramadan.

I met with the entire Muslim community at the Ellis Unit on October 2, 2006, with Prince and the others in attendance. I attended the Jumah prayer service on October 6, 2006, and observed Prince in attendance. He also attended the services on October 7th and 13th. On October 21st, I met again with the entire Muslim community at Ellis and informed them that after considerable thought, I was retaining Jones as the Coordinator because there was no justification to remove him. At this time, Prince got angry and, as he left the chapel, he told me to remove him from the Muslim roster as he was not coming back.

On January 12, 2007, Offender Prince began attending the Jumah prayer services again. His subsequent attendance record at prayer meetings has been inconsistent – he attended approximately 161 of 254 prayer services from October 2, 2006, to July 28, 2007.

A similar incident occurred at the Beto Unit in April 2008 when the Muslim offender coordinator was creating discord with the Muslim community by being untruthful with them. As a result, I suspended Muslim services there until June 13, 2008, after that coordinator had been removed and transferred from the unit. There have been two other incidents in my area of responsibility involving a suspension of Muslim services due to discord within the community. When those incidents were resolved, services were reinstated. Although I do not like to suspend religious activities, if a security threat is present, it is the only method that can be used to immediately prevent any problems. This is particularly true in respect to the Muslim religious activities,

10

since under Brown v. Beto, they often meet without a[n] outside volunteer or chaplain present.  Services are reinstated as soon as the safety of the situation can be resolved.

I am knowledgeable of TDCJ Policy AD 7.30 which governs religious services.  It states that religious services shall be governed by unit rules, regulations and policies relating to offender conduct.  It also states that the warden's designee shall temporarily discontinue a religious service or meeting if the orderly conditions of the unit are disturbed.  I have attached a copy of that policy to this affidavit.  I am also knowledgeable of the Offender Handbook which forbids abusive behavior towards others.

(Docket Entry No. 21, Exhibit A.)

Under TDCJ Policy AD 7.30 (rev. 6), "Procedures for Religious Programming,"

Section IV(D),

Attendance at approved services of worship, religious activities, and meetings of a religious nature shall be subject to the following considerations:

*    *    *    *

5.    The Warden may deny any offender permission to attend such activities if the offender's attendance *could* affect the safe and secure operation of the unit or the safety of an individual offender[.]

(Emphasis added.)

Section X of the Policy further provides that, "All claims of a burden on the free exercise of an offender's religious practice shall be referred to the unit Chaplain."

After a careful review of the record and the parties' arguments, and in recognition of the deference owed the professional judgment of prison officials, this Court finds that the policy provision under which plaintiffs were temporarily suspended from religious services

11

bears a reasonable relationship to the legitimate penological interests of prison safety and security. Plaintiffs clearly caused a disruption of the scheduled prayer service meeting on July 14, 2006, by using the religious gathering as an opportunity to promote their criticisms of Jones and to call for his resignation. Their actions prompted administrative intervention and raised reasonable prison safety and security concerns, as expressed by both Shabazz and Wakefield. The policy provision allowing an offender to be denied permission to attend religious activities if the offender's attendance "could affect the safe and secure operation of the unit or the safety of an individual offender" is rationally related to a prison's objective of maintaining safe and secure operation of the prison or the security of an offender. Defendants are entitled to summary judgment dismissing plaintiffs' religious free exercise claims.

Because portions of plaintiffs' pleadings are imprecise, the Court liberally construes their complaint as also raising a First Amendment free speech violation. To the extent plaintiffs may be complaining that their right to complain about Jones was unconstitutionally restricted, and notwithstanding their failure to comply with 42 U.S.C. § 1997e(e) regarding the pleading of a physical injury, their free speech claim is without merit. Prison inmates do retain, in a general sense, a right to criticize prison officials. *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). To succeed, plaintiffs must do more than point to the existence of a generic First Amendment right; they must also establish that they exercised that right in a manner consistent with their status as prisoners. Although internal prison grievance

procedures remained open to plaintiffs in the instant case, they did not file grievances

regarding Jones until *after* the events and consequences of July 14, 2006, unfolded. Plaintiffs

point this Court to no constitutional authority allowing them to use a prison-approved

religious event as a forum for airing personal criticisms of a prison-approved religious

coordinator. *See, e.g., Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854 (5th Cir. 2004).

Accordingly, plaintiffs do not establish as a matter of law that they exercised a First

Amendment right in a manner consistent with their status as prisoners on July 14, 2006, and

no constitutional violation is shown.

## V.  CLAIMS UNDER RLUIPA

Plaintiffs claim that their six month suspension from Muslim services constituted a

violation of RLUIPA.  Under RLUIPA,

> No government shall impose a substantial burden on the religious exercise of
> a person residing in or confined to an institution . . . even if the burden results
> from a rule of general applicability, unless the government demonstrates that
> imposition of the burden on that person–
>
> > (1)  is in furtherance of a compelling governmental interest; and
> >
> > (2)  is the least restrictive means of furthering that compelling
> > governmental interest.

42 U.S.C. § 2000cc-1(a).  The term 'religious exercise' includes any exercise of religion,

whether or not compelled by, or central to, a system of religious belief.   *Id.*, §

2000cc-5(7)(A); *see Adkins v. Kaspar*, 393 F.3d 559, 567-68 (5th Cir. 2004).  The plaintiff

bears the burden to show that the challenged government action imposes a substantial burden

on his religious exercise. *Adkins*, 393 F.3d at 567. A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. *Id.* at 570. Hence, the RLUIPA standard poses a far greater challenge than does *Turner* to prison regulations that impinge on an inmate's free exercise of religion. *See Turner v. Safley*, 482 U.S. 78, 90 (1987) (explicitly rejecting application of the "least restrictive means" standard to inmate's First Amendment free exercise claims).

In the context of a prison setting, RLUIPA requires that prison officials refrain from (1) substantially burdening an inmate's free exercise of his religion unless, when strictly scrutinized, (2) the burden "is in furtherance of a compelling governmental interest" and (3) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000cc-1(a). The initial burden is on the plaintiff to demonstrate that the government practice complained of imposes a substantial burden on his religious exercise. *Adkins*, 393 F.3d at 567. If a substantial burden is proven, the government must demonstrate that the "compelling interest" test is satisfied.

As an initial consideration, defendants assert that plaintiffs are not entitled to monetary damages against them under RLUIPA in either their individual or official capacities. The Fifth Circuit recently held that RLUIPA does not create a cause of action against prison employee defendants in their individual capacities, and that sovereign immunity bars recovery of damages against the employees in their official capacities. *See*

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.), *petition for cert. filed*,

No. 08-1438 (2009). Thus, pursuant to *Sossamon*, plaintiffs' RLUIPA claims for monetary

damages against the defendants are dismissed. *Sossman* does not, however, preclude

plaintiffs from seeking a declaratory judgment for a violation of RLUIPA and recovery of

nominal damages.

With that in mind, a revisiting of Shabazz's summary judgment affidavit is

appropriate at this juncture. In his affidavit, Shabazz testified as follows:

> I am the Islamic Chaplain for the Texas Department of Criminal Justice
> (TDCJ) with responsibility for about thirty state-operated and privately-
> operated prison units, including the Ellis Unit in Huntsville, Texas. There are
> approximately 7324 Muslim offenders in TDCJ. In accordance with the
> Brown v. Beto consent decree, the number of Islamic chaplains is determined
> based on the number of Muslim inmates in comparison to the total inmate
> population. There are currently 3 Islamic chaplains, and each one is assigned
> a region.
>
> Since I have responsibility for many units, I cannot attend each Muslim prayer
> service at each unit and, again in accordance with the Brown v. Beto consent
> decree, a qualified Muslim offender is approved and appointed by the unit
> warden, the unit chaplain and myself to serve as the Coordinator for the
> Muslim community at each unit in my area of responsibility. The selection
> process and qualifications to serve as the Muslim offender Coordinator are set
> forth in TDCJ Chaplain Policy 06.06. A copy of that policy is attached to this
> affidavit.
>
> Offender L.C. Jones volunteered and was approved to serve as the Ellis Unit
> Muslim Offender Coordinator approximately five or six years ago. He is
> assigned to facilitate the most important worship event in Islam – the weekly
> Jumah prayer service – and provide coordinating assistance to the unit chaplain
> or myself with the unit's Muslim community regarding scheduled Islamic
> meetings, faith activities and practices. As a coordinator, Offender Jones is
> expected and required to conduct himself in accordance with Islamic law and

TDCJ rules and policies. He is also required to constantly advise the unit chaplain and/or me regarding all issues that arise.

In 2006, I became ill and was unable to visit my assigned units for a few months. During my convalescence in July 2006, I was advised that Offender Michael Prince and several other Muslim offenders disrupted the Jumah prayer service with a demand that offender Jones be removed as the coordinator. Offender Jones and Sergeant David Franshaw called me at home to discuss this situation. I requested that unit security bar Offender Prince and his supporters from Islamic services until I was able to meet with them. On September 7, 2006, I released all but Prince and four others from the suspension. I made this decision so that as many of the Muslim offenders as possible could participate in religious activities without the possibility of another security issue occurring. Ramadan began on September 23, 2006 and continued until October 22, 2006. Prince and four other offenders did not openly participate in Ramadan due to the suspension, but I was informed that with help from other Muslim offenders Prince did observe the fasting requirements for Ramadan.

I met with the entire Muslim community at the Ellis Unit on October 2, 2006 with Prince and the others in attendance. I attended the Jumah prayer service on October 6, 2006 and observed Prince in attendance. He also attended the services on October 7th and 13th. On October 21st, I met again with the entire Muslim community at Ellis and informed them that after considerable thought, I was retaining Jones as the Coordinator because there was no justification to remove him. At this time, Prince got angry and, as he left the chapel, he told me to remove him from the Muslim roster as he was not coming back.

On January 12, 2007, Offender Prince began attending the Jumah prayer services again. His subsequent attendance record at prayer meetings has been inconsistent – he attended approximately 161 of 254 prayer services from October 2, 2006 to July 28, 2007.

*   *   *   *

I am knowledgeable of TDCJ Policy AD 7.30 which governs religious services. It states that religious services shall be governed by unit rules, regulations and policies relating to offender conduct. It also states that the warden's designee shall temporarily discontinue a religious service or meeting if the orderly conditions of the unit are disturbed. I have attached a copy of

that policy to this affidavit.   I am also knowledgeable of the Offender Handbook which forbids abusive behavior towards others.

(Docket Entry No. 21, Exhibit A.)

Plaintiffs claim under penalty of perjury that, by calling for Jones's resignation during the prayer service meeting before prayers actually began, they created no disturbance and presented no security or safety concern, and that, despite the non-disruptive nature of their actions, they were suspended from attending services from July 14, 2006, until January 12, 2007.  (Docket Entry No. 28, p. 5.)  The actual duration of their suspension is unclear, as Shabazz testified in his affidavit that Prince attended Muslim services in October 2006, demanded to be removed from the Muslim roster when Jones was not terminated, but began attending services again on January 12, 2007.

The undisputed facts clearly show, and defendants do not disagree, that plaintiffs' exclusion from Muslim services during the relevant time period (whether three months or six months) substantially burdened their free exercise of religion.  Accordingly, the Court must consider whether defendants had a compelling governmental interest in maintaining prison order, discipline, and security.

Although RLUIPA imposes a strict scrutiny test on prison regulations, the Supreme Court has indicated that courts are to apply that standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Cutter v. Willkinson*, 544 U.S. 709, 721

17

(2005). Prison security is a compelling state interest, and RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and discipline. *Id.* at 722.

In his affidavit, Shabazz testified that, "Although I do not like to suspend religious activities, if a security threat is present, it is the only method that can be used to immediately prevent any problems. This is particularly true in respect to the Muslim religious activities, since under Brown v. Beto, they often meet without a outside volunteer or chaplain present. Services are reinstated as soon as the safety of the situation can be resolved." (Docket Entry No. 20, Exhibit A.)  Shabazz further testified that he "was advised that Offender Michael Prince and several other Muslim offenders disrupted the Jumah prayer service with a demand that offender Jones be removed as the coordinator." *Id.*  Plaintiffs themselves admit that, prior to commencement of prayer at the Muslim services, they accused Jones of being incompetent and asked him to step down as inmate coordinator. (Docket Entry No. 28, p. 4.)  When Jones refused, Prince, using the microphone, began speaking to the entire group. Jones took the microphone back from Prince and told him that he (Prince) was not speaking, but Prince continued speaking without the microphone. *Id.*  Jones left the chapel and returned with defendant Sergeant Franshaw. Franshaw told the group that they should wait for Shabazz to chose another coordinator, and that they were free to leave.

Although plaintiffs baldly state that their actions on July 14, 2006, caused no disruption or security issue, the record clearly evinces the contrary.  By directly confronting

18

Jones during the meeting and continuing to talk despite Jones's instructions to stop, and causing Jones to secure Franshaw's intervention to restore order, plaintiffs interrupted and disrupted the Muslim prayer service meeting.  Plaintiffs present no argument or summary judgment evidence that they attempted to resolve their dissatisfaction with Jones through administrative procedures *prior* to taking matters into their own hands on July 14, 2006, during Shabazz's prolonged medical absence.  Defendants had a compelling government interest in maintaining order, discipline, and security during inmate religious meetings and prayer services, and plaintiffs' actions on July 14, 2006, disrupted that order, discipline, and security.  The first two RLUIPA factors are met.

However, the third RLUIPA factor – whether defendants furthered those compelling government interests through the least restrictive means possible – is significantly less evident.  Plaintiffs assert that, as a result of instructions from Shabazz, they were not allowed to participate in Muslim services for six months, until Shabazz authorized them to return to services.  The burden is on defendants to show that this temporary suspension was the least restrictive means available to further the prison's compelling interest in maintaining order, discipline, and security.

Defendants urge that plaintiffs' suspension from services was the least restrictive means available for maintaining prison order, discipline, and security, because if plaintiffs and the three other Muslim inmates were allowed to meet on their own, then "any group would then be able to state, 'we don't like the person leading our service,' and be able to

19

meet on their own." (Docket Entry No. 20, p. 20.) This argument is unpersuasive. Plaintiffs were denied access to the Muslim services based on their disruptive behavior, not because they were dissatisfied with Jones as inmate coordinator. It is apparent from Shabazz's affidavit testimony that he suspended plaintiffs from Muslim services until he was able to verify for himself that plaintiffs presented no further security threat, and that he suspends religious activities for security threats "when it is the only method that can be used to *immediately* prevent any problems." (Docket Entry No. 21, Exhibit A, p. 2, emphasis added.) Shabazz states that this response is authorized under prison policy AD 7.30, which provides that, "the warden's designee shall *temporarily* discontinue a religious service or meeting if the orderly conditions of the unit are disturbed." *Id.*, emphasis added.

The Court has emphasized the key terms "immediately" and "temporarily," as within those terms lies the Court's concern with the defendants' actions: plaintiffs have presented probative summary judgment evidence that this immediate but purportedly temporary suspension from religious services continued for six months. While the Court agrees with defendants' assertion that plaintiffs were the cause of their own temporary suspension, (Docket Entry No. 20, p. 20), it was defendants' actions (or inaction) that prolonged the "temporary" suspension. According to Shabazz's affidavit, Shabazz did not meet with the inmate Muslim community until October 2, 2006, nearly three months after plaintiffs' suspension from religious services. On October 21, 2006, Shabazz again met with the community and announced his decision to retain Jones as inmate coordinator. Thus, it is

clear from the record that Shabazz was again working at the Ellis Unit by October 2, 2006. Shabazz does not state what date he terminated plaintiffs' suspension, or put forth any explanation as to why plaintiffs were not provided lay-ins to return to religious services until January 12, 2007.

In short, defendants fail to meet their burden of establishing that suspending plaintiffs from religious services from July 14, 2006, through January 12, 2007, was the least restrictive means of promoting prison safety and security as to plaintiffs' single incident of disruptive behavior on July 14, 2006. Accordingly, a genuine issue of material fact exists as to plaintiffs' claim for declaratory relief and nominal damages under RLUIPA, and summary judgment is denied as to this issue.

## VI.  CLAIM FOR DENIAL OF EQUAL PROTECTION

Plaintiffs claim that defendants violated their equal protection rights by continuing to exclude them from Muslim religious services after all other Muslim inmates but five were allowed to return to full participation.

To establish an equal protection violation, plaintiffs must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated. *Baranowski v. Hart*, 486 F.3d 112, 123 (5th Cir. 2007); *see also Sossamon*, 560 F.3d at 336. Discriminatory intent "implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing

21

its adverse effect on an identifiable group." *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988) (internal quotation marks omitted).

The probative summary judgment evidence does not support plaintiffs' claim. As testified by Shabazz, those Muslim inmates who did not constitute a security risk or threat were allowed to return to religious services. Plaintiffs were not allowed to return to services because Shabazz had not yet determined whether they posed a security risk or threat. Thus, plaintiffs were not "similarly situated" to the Muslim inmates who had been cleared as security risks or threats. Plaintiffs present no competent summary judgment evidence of disparate treatment or purposeful discrimination supporting an equal protection violation, and defendants are entitled to summary judgment dismissing this claim.

## VII.   CLAIM FOR CONSPIRACY

Plaintiffs allege that the defendants conspired to violate their federal constitutional and statutory rights regarding free exercise, as shown by the inter-office memo of July 17, 2006, barring them from religious services. A plaintiff alleging conspiracy under section 1983 must allege and prove facts showing an agreement to commit an illegal act. *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982). Plaintiffs claim that the defendants conspired by telephone and/or fax to delete plaintiffs' names from the Muslim inmate list and to suspend them from attending Muslim religious services. As previously discussed, however, plaintiffs were suspended from participating in Muslim services as a result of their own actions of July 14, 2006. Their suspension from religious services for security reasons

did not constitute an illegal act, and thus defendants' underlying discussions, decisions, and/or actions culminating in the suspension did not constitute an actionable conspiracy.

Further, to successfully pursue a claim of conspiracy to deprive a plaintiff of his constitutional rights under 42 U.S.C. § 1985(3), a plaintiff must allege and prove (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprivation of any right or privilege of a citizen of the United States. *Hilliard v. Ferguson,* 30 F.3d 649 (5th Cir. 1994). Where all of the defendants are members of the same collective entity, the conspiracy does not involve two or more people. *Id.* at 653. Because all of the defendants in the instant case are employees of the same collective entity, no cause of action for conspiracy is presented. Defendants are entitled to summary judgment dismissing plaintiffs' conspiracy claim.

## VIII.  CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1.   Defendants' motion for summary judgment (Docket Entry No. 20) is **GRANTED IN PART**, and plaintiffs' claims for injunctive relief, for violation of their First Amendment and equal protection rights, and for conspiracy, are **DISMISSED**.

2.   Defendants' motion for summary judgment (Docket Entry No. 20) is **DENIED IN PART** as to plaintiffs' declaratory judgment claim for recovery of nominal damages under RLUIPA.

3.    Any further or amended dispositive motions must be filed by **NOVEMBER 1, 2009**.

4.    The Court will enter a separate pretrial docket control order.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas, on this the 25th day of September, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE